**FEDERAL ELECTION COMMISSION, Plaintiff,**

v.

**INTERNATIONAL FUNDING INSTITUTE, INC., et al., Defendants.**

**No. 91–5013.**

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc April 29, 1992.

Decided July 10, 1992.

As Amended Aug. 5, 1992.

---

**1112**

Richard B. Bader, Associate General Counsel, Federal Election Com'n, with whom Lawrence Noble, General Counsel, and Vivien Clair, Attorney, Washington, D.C., were on the brief, for plaintiff.

David M. Kopstein, Washington, D.C., for defendants.

Thomas J. Casey and Richard L. Brusca were on the brief for amicus curiae Legi-Tech, Inc. Roberto Iraola and Andrew L. Sandler, Washington, D.C., also entered appearances, for amicus.

Before MIKVA, Chief Judge, WALD, EDWARDS, RUTH BADER GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Concurring opinion filed by Circuit Judge RUTH BADER GINSBURG, in which Circuit Judge EDWARDS joins.

Concurring opinion filed by Circuit Judge EDWARDS.

Concurring opinion filed by Circuit Judge BUCKLEY.

Concurring opinion filed by Circuit Judge RANDOLPH.

D.H. GINSBURG, Circuit Judge:

The Federal Election Commission filed suit against the International Funding Institute, Inc., American Citizens for Political Action, Inc., and Robert Dolan (as treasurer of ACPA), alleging that the defendants violated the Federal Election Campaign Act, 2 U.S.C. § 438(a)(4), which provides that the list of contributors that a political committee must place on file with the FEC may not be sold or used by anyone else to solicit contributions or for a commercial purpose. The defendants moved to dismiss, arguing that the use restriction of § 438(a)(4) is unconstitutional, both on its face and as applied to their conduct, because it infringes upon their first amendment right to solicit contributions for a political cause.

The district court certified the constitutional question directly to this court en banc, as required by 2 U.S.C. § 437h. *FEC v. International Funding Inst.*, C.A. No. 90–1623, Order Certifying Constitutional Question and Findings of Fact to the Court of Appeals (D.D.C. Jan. 25, 1991). We hold that the use restriction in § 438(a)(4) is subject to at most an intermediate level of scrutiny for consistency with the first amendment, and that it serves an important governmental interest and is no broader than necessary to serve that interest. Accordingly, we hold that the statute is constitutional on its face and as applied to the defendants' conduct.

I. BACKGROUND

The Federal Election Campaign Act, 2 U.S.C. §§ 431–455, requires each political committee periodically to report to the FEC the name and mailing address of each "person ... who makes a contribution to the reporting committee ... [aggregating $200 or more] within the calendar year." *Id.* § 434(b)(3)(A). Section 438(a)(4) directs the FEC to make those reports

available for public inspection, and copying except that any information copied from such reports ... may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes.... A political committee may submit 10 pseudonyms on each report filed in order to protect against the illegal use of names and addresses of contributors....

In 1986 IFI (through Dolan, its sole stockholder, director, and officer) subscribed to Campaign Contribution Tracking System, a commercial on-line data base service provided by amicus Legi–Tech, Inc., that compiles information from the political committee disclosure reports that the FEC makes public under § 438(a)(4). Using that information as its sole source, IFI developed a mailing list entitled "Active Republican Donors." IFI then contracted to market that list through a list broker who in turn rented the list to approximately five customers—including ACPA (through Dolan, its chairman and treasurer). ACPA used the list to conduct five test mailings, each of which solicited contributions from approximately 5000 persons whose names appear on the list.

Based upon these facts, the FEC determined that there was probable cause to believe that IFI, ACPA, and Dolan had knowingly and willfully violated § 438(a)(4). After trying to settle the matter, the Commission brought this suit in the district court. The defendants moved to dismiss, arguing that the statute is unconstitutional on its face and as applied to their conduct, and the district court certified to us the following question:

> Do the provisions of 2 U.S.C. § 438(a)(4) which prohibit the sale or use of individual information copied from reports filed with the Commission for the purpose of soliciting contributions or for commercial purposes violate the First Amendment of the Constitution of the United States, either on their face or as applied to the defendants' conduct?

For the reasons set out below, we answer that question in the negative.

## II. THE LEVEL OF SCRUTINY

■ The defendants argue that the use restriction of § 438(a)(4) is subject to strict scrutiny because it is a direct infringement upon activity protected by the first amendment, or, in the alternative, because it prohibits speech in a way that is not content-neutral. The FEC (which asserts that § 438(a)(4) would withstand strict scrutiny) argues that it is subject only to intermediate scrutiny, in part because the statute regulates commercial speech, which is entitled to less protection than political speech. We think that neither party has it quite right.

The defendants' primary argument here is that soliciting contributions for a political cause is protected first amendment activity, *United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 3118, 111 L.Ed.2d 571 (1990), and "[s]tatutory restrictions on such conduct are ... 'always subject to exacting judicial review,'" quoting *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981). The implicit premise of this argument is that the FECA in some way infringes upon the defendants' right to solicit contributions for a political cause. But that is not at all the case.

Prior to enactment of the FECA, the defendants had no right even to inspect another political committee's list of contributors. Section 438(a)(4) grants the defendants (and the public) access to the contributor list of another political committee, but at the same time the statute restricts their use of such a list. In no way does § 438(a)(4) impose any new burden upon the defendants, however. Rather, the statute simply leaves undisturbed a pre-existing barrier to the defendants' use of another committee's list to solicit contributions: In order for the defendants to use the list to solicit, they must, as before the passage of the FECA, obtain the other committee's permission, perhaps at a price. Thus, the Act cannot be said in any sensible way to infringe upon the defendants' first amendment right to solicit contributions for a political cause. *See Regan v. Taxation With Representation*, 461 U.S. 540, 549–

50, 103 S.Ct. 1997, 2002–03, 76 L.Ed.2d 129 (1983) ("Although government may not place obstacles in the path of a [person's] exercise of ... freedom of [speech], it need not remove those obstacles not of its own creation") (quoting *Harris v. McRae*, 448 U.S. 297, 316, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980)) (alterations in original); *see also id.* at 549 ("a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right"); *Cammarano v. United States*, 358 U.S. 498, 515, 79 S.Ct. 524, 535, 3 L.Ed.2d 462 (1959) (Douglas, J., concurring) (rejecting the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State").

The defendants are in a position similar to that of the newspaper in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), which challenged a trial court order prohibiting it from publishing certain information that it had obtained through civil discovery. In part because the newspaper in that case had obtained the information "pursuant to a court order that both granted [the newspaper] access to that information and placed restraints on the way in which the information might be used," the Supreme Court rejected the newspaper's claim that the use restriction was subject to strict scrutiny. *Id.* at 32, 104 S.Ct. at 2207. Instead, the Court applied intermediate scrutiny, requiring only that the restriction further "an important or substantial governmental interest unrelated to the suppression of expression" and be "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* (quoting *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974), overruled in

part by *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

Both in *Seattle Times* and here, the Government compelled disclosure of information for a particular purpose and prohibited use of that information for other purposes; like the newspaper in *Seattle Times*, the defendants here have no claim of right to the benefit of the compelled disclosure apart from the measure in which the concomitant use restriction is found. Because the defendants had no pre-existing right to use another committee's contributor lists to solicit contributions, we do not believe that the use restriction of § 438(a)(4) directly restricts the defendants' first amendment right to solicit contributions for a political cause. We hold therefore that § 438(a)(4) is not subject to strict scrutiny upon the first ground asserted by the defendants.[*]

The defendants appear to argue as a fallback position that even if § 438(a)(4) does not newly restrict their ability to solicit contributions, it should still be scrutinized strictly because it "selectively prohibits solicitation" and is therefore "not content-neutral." *See Regan v. Time, Inc.*, 468 U.S. 641, 648–49, 104 S.Ct. 3262, 3267, 82 L.Ed.2d 487 (1984) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment"). The defendants do not contend— nor could they—that § 438(a)(4) is anything but neutral as to the views for which it bars soliciting contributions. Instead, they argue that by providing the public with access to an inexpensive source of names, the Act in effect facilitates all forms of political speech except (and in that limited sense "selectively prohibits") the solicitation of contributions: Under § 438(a)(4), the defendants may use another commit-

---

[*] Notwithstanding Judge Randolph's implication, concurring op. at 2, we do not think that the Court's overruling of *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) in *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) undermines the *Seattle Times* decision. Both *Martinez* and *Abbott* involved restrictions on the mail privileges of prison inmates, the former applying intermediate scrutiny to one such restriction and the latter applying a species of rational basis scrutiny; in contrast, *Seattle Times* involved a protective order entered in the discovery phase of a civil trial. Although the Court in *Seattle Times* quoted *Martinez* for the precise verbal formulation of the intermediate scrutiny standard, the Court did not rely upon *Martinez* in deciding that the protective order before it was subject to intermediate scrutiny.

tee's list to seek popular support for a particular policy, or to solicit signatures on a petition, or to urge recipients not to contribute to a rival cause, but they may not use the list to solicit contributions. Under the implementing regulation promulgated by the FEC, they may even publish information from another committee's list "in newspapers, books, magazines or other similar communications ... as long as the principal purpose of such communication is not to communicate any contributor information listed on such reports for the purpose of soliciting contributions or for other commercial purposes." 11 C.F.R. § 104.-15(c).

■ This argument comes down to the proposition that, if the Government facilitates some type of speech, then its decision not to facilitate another, related type of speech is subject to strict scrutiny. Yet just last Term in *Rust v. Sullivan,* — U.S. ——, 111 S.Ct. 1759, 1773, 114 L.Ed.2d 233 (1991), the Supreme Court expressly repudiated the notion that the first amendment requires "that if the government chooses to subsidize one protected right, it must subsidize analogous counterpart rights." Indeed, the Supreme Court has consistently given less than strict scrutiny to statutes that promote one, but not another closely related, first amendment activity. *See id.* 111 S.Ct. at 1771–76 (rejecting first amendment challenge to restriction on abortion counselling at federally funded health clinics without reference to a "compelling government interest" or "narrow tailoring"); *Taxation With Representation,* 461 U.S. at 549, 103 S.Ct. at 2003 (statute that denies tax benefit to non-profit organization that engages in lobbying "is not subject to strict scrutiny"); *see also FCC v. League of Women Voters,* 468 U.S. 364, 380, 104 S.Ct. 3106, 3117, 82 L.Ed.2d 278 (1984) (applying intermediate scrutiny to ban on editorials by federally funded public broadcasting stations, although relying more upon the nature of the broadcast medium than upon the regulatory scheme to determine the level of scrutiny).

■ We note also that the Supreme Court has consistently scrutinized more closely statutes that condition the receipt of a government benefit upon the recipient's altering its independently funded activities, *see, e.g., id.* at 400, 104 S.Ct. at 3127 (statute prohibiting all editorializing on public broadcasting station that receives any public funds); *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (state property tax exemption conditioned upon signing loyalty oath), than it scrutinizes statutes that restrict only the use to which the recipient may put the government benefit, *see, e.g., Rust v. Sullivan,* 111 S.Ct. at 1775 n. 5 (clinic receiving federal funds may establish separate, privately funded clinic to engage in abortion counselling); *Taxation With Representation,* 461 U.S. at 544, 103 S.Ct. at 2000 (non-profit corporation may retain tax benefit by using separate entity for lobbying); *cf. Harris,* 448 U.S. at 317 n. 19, 100 S.Ct. at 2688 n. 19 (government need not pay for abortion for a Medicaid-recipient, but "[a] substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion"). The use restriction of § 438(a)(4) fits neatly within the latter category; it in no way restricts anything but the use to which one may put the compulsorily disclosed list of a political committee.

■ Alternatively, the defendants' brief may be read to argue that whenever the government makes information available for some purposes but forbids the use of that information for other purposes, the use restriction is, by its very nature, not content-neutral and therefore must be subject to strict scrutiny. But, as we have already seen, it is not true that every use restriction is subject to strict scrutiny: In *Seattle Times* the Supreme Court applied only intermediate scrutiny to a restriction on the use of information that the government had commanded to be disclosed. *See* 467 U.S. at 32, 104 S.Ct. at 2207. For the foregoing reasons, we reject the defendants' arguments that we should scrutinize § 438(a)(4) strictly.

What level of scrutiny does apply, then? We pointed out above that in *Seattle Times* the Court applied intermediate scrutiny to a court order similar in important respects to § 438(a)(4). The exact level of less than strict scrutiny that the Court applied in *Taxation With Representation* and *Rust v. Sullivan*—which also involved restrictions analogous to § 438(a)(4)—is less clear, however. In those cases the Court apparently held that so long as the purpose of a statute is not to "suppress[ ] ... dangerous ideas," *Rust v. Sullivan*, 111 S.Ct. at 1772 (quoting *Cammarano*, 358 U.S. at 513, 79 S.Ct. at 533); *Taxation With Representation*, 461 U.S. at 550, 103 S.Ct. at 2003 (quoting same), it is constitutional if it has a rational basis, *see Rust v. Sullivan*, 111 S.Ct. at 1771–76 (no mention of an "important" or "substantial" government interest); *Taxation With Representation*, 461 U.S. at 544–46, 103 S.Ct. at 2000–01 (same); *see also id.* at 550, 103 S.Ct. at 2003 ("It is not irrational for Congress to decide that tax-exempt charities such as TWR should not further benefit at the expense of taxpayers at large by obtaining a further subsidy for lobbying").

There may thus be a conflict between *Seattle Times*, on the one hand, and *Rust v. Sullivan* and *Taxation With Representation*, on the other. We need not join that issue today, however, because we conclude, for the reasons set out below, that the statute passes muster even under the more demanding standard. Therefore, we assume (but do not decide) that the use restriction of § 438(a)(4) is subject to intermediate scrutiny.

### III. THE GOVERNMENT INTEREST

■ The FEC asserts that the use restriction of § 438(a)(4) is narrowly drafted to advance two important governmental interests. First, the FEC argues that, as can be seen from the face of the statute, § 438(a)(4) protects a political committee against losing the economic value of its contributor list merely because it must publicly disclose the list. Second, relying upon legislative history, the FEC argues that the statute is intended to protect contributors from unwanted solicitation. *See National Republican Congressional Comm. v. Legi–Tech Corp.*, 795 F.2d 190, 192–93 (D.C.Cir.1986) (recounting legislative history). We begin, of course, with the statute itself, recurring to the legislative history only if necessary.

The district court found as a fact that a "political committee's contributor lists are its most valuable assets," the product of "time-consuming, labor-intensive activities that can cost a political committee thousands, even millions, of dollars." *See also id.* at 191 ("NRCC's ... principal business asset is its list of donors, created through an expensive and laborious process of targeting and soliciting likely contributors"). Therefore, political committees "safeguard the confidentiality of their contributor lists" and disclose them to the public only under the compulsion of the Act. The district court also found that the economic value of a contributor list would be reduced if a competing fundraiser were able to obtain the list and to use it to solicit contributions. *See also National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 878 (D.C.Cir.1989) ("business people will not overlook an opportunity to get cheaply from the Government what otherwise comes dearly, a list of qualified prospects"). Thus, the use restriction of § 438(a)(4) protects against that diminution of value by preserving for the compiling committee the exclusive right to use its contributor list to solicit contributions, a right that the compiling committee would but for the Act have protected simply by keeping the list secret.

The FEC does not argue solely that § 438(a)(4) protects the value of a political committee's intellectual property for its own sake, although that interest alone might qualify as "substantial." *See San Francisco Arts & Athletics v. United States Olympic Comm.*, 483 U.S. 522, 537–39, 107 S.Ct. 2971, 2981–82, 97 L.Ed.2d 427 (1987) (substantial governmental interest in granting the USOC, a private corporation, exclusive right to use the word "Olympic"); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04, 104 S.Ct. 2862, 2873–74, 81 L.Ed.2d 815 (1984) (trade secret is property

right protected by takings clause); *cf. San Francisco Arts & Athletics,* 483 U.S. at 541, 107 S.Ct. at 2983 (a party has no "First Amendment right to 'appropriat[e] to itself the harvest of those who have sown' ") (quoting *International News Serv. v. Associated Press,* 248 U.S. 215, 239–40, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918)) (alteration in original). In addition the FEC argues that by protecting the economic value of such contributor lists, the use restriction of § 438(a)(4) preserves political discourse at its pre-Act level.

■ The Commission's point is well-taken. Without the use restriction of § 438(a)(4), innumerable entrepreneurs would, like the defendants here, be able freely to appropriate to themselves part of the value of the contributor lists compiled by reporting political committees. As a result, such committees would have less incentive to compile the lists in the first place. In other words, if the return on their investment in solicitation would be reduced by others using the resulting lists, political committees would not find it worthwhile to solicit as much as they now do; they would raise less money, spend less money, and correspondingly underwrite less political discourse. *Cf. Buckley v. Valeo,* 424 U.S. 1, 19, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976) (statutory limit on campaign spending "necessarily reduces the quantity of [political] expression … because virtually every means of communicating ideas in today's mass society requires the expenditure of money"). The FEC thus argues persuasively that, far from discouraging political discourse, the use restriction of § 438(a)(4) "helps to preserve the viability of the system of private financing of elections." That is, the use restriction protects political discourse from the adverse effect that the disclosure requirement of the Act would otherwise have.*

The defendants do not take issue with the FEC's assertion that the use restriction of § 438(a)(4) promotes political discourse; nor are they so fond as to argue that preserving political discourse is not an important governmental interest. Rather, they argue that a political committee has no cognizable property right in the contributor list it creates because a list of names and addresses is not sufficiently original to warrant protection under the Copyright Act. *See Feist Publications v. Rural Tel. Serv. Co.,* —— U.S. ——, 111 S.Ct. 1282, 1296–97, 113 L.Ed.2d 358 (1991).

■ Assuming that a political committee's contributor list is not subject to protection under the Copyright Act, however, it does not follow that the use restriction in § 438(a)(4) is invalid. The protection afforded to a political committee by § 438(a)(4) is not a copyright: The information in the report submitted by a political committee may freely be copied, published, and with one exception, used in any way. Indeed, the Congress enacted § 438(a)(4) not pursuant to its constitutional power to "secur[e] for limited Times to Authors … the exclusive Right to their respective Writings," U.S. Const. art. I, § 8, cl. 8, which is subject to the requirement of originality, *see Feist Publications,* 111 S.Ct. at 1288, but to its power to regulate federal elections, U.S. Const. art. I, § 4, cl. 1. *See Buckley v. Valeo,* 424 U.S. at 13 & n. 16, 96 S.Ct. at 632 & n. 16; S.Rep. No. 229, 92nd Cong., 1st Sess. 99 (1971). In exercising the latter power, the Congress may recognize an intellectual property interest, narrower than copyright, that is not subject to the constitutional requirement of originality. *Cf. San Francisco Arts &*

* Judge Randolph suggests that the governmental interest discussed in the text cannot withstand intermediate scrutiny because it is "not supported by any legislative factual findings." Concurring op. at 1120–21. It appears, however, that a restriction on first amendment activity occasioning intermediate scrutiny need not be supported by such a finding: In *Seattle Times* the Court upheld a restriction on free expression subject to intermediate scrutiny without demanding empirical support for the premise that underlay the restriction. *See* 467 U.S. at 31–36, 104 S.Ct. at 2206–09. Perhaps the Court does not require such support for the very reason that, as Judge Randolph states, "[t]he accuracy of legislative judgments giving rise to free speech claims is not, as a general matter, readily susceptible to empirical demonstration," concurring op. at 1120–21.

*Athletics,* 483 U.S. at 539–40, 107 S.Ct. at 2982–83 (upholding congressional grant of trademark-like protection to the USOC for the word "Olympic" even though it exceeds traditional boundaries of trademark protection).

■ Alternatively, viewing the use restriction of § 438(a)(4) as a non-copyright species of intellectual property, the defendants argue that it is inconsistent with the first amendment: "Under our system of government," they say, "no person has a property interest in the political sympathies of another." Clearly, however, § 438(a)(4) does not create a "property interest in the political sympathies of another." Rather, it narrowly protects the value of the list itself in a particular use; it does not prevent one from soliciting a person who is on a committee's contributor list, so long as one does not obtain that person's name (directly or indirectly) from a list filed with the FEC.

## IV. CONCLUSION

Section 438(a)(4) advances an important governmental interest, *viz.* in reserving the value of a contributor list to the political committee that creates it, and is no broader than is necessary to that task. Therefore, even if intermediate scrutiny is appropriate, § 438(a)(4) is not unconstitutional as applied to the defendants' conduct. We need not reach the FEC's alternative argument, bolstered by legislative history, that the governmental interest in protecting contributors from unwanted solicitations is sufficient to withstand scrutiny under the first amendment.

■ The defendants' facial challenge to § 438(a)(4) can succeed only if the statute may "never be applied in a valid manner" or is "written so broadly that [it] may inhibit the constitutionally protected speech of third parties." *Members of the City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984); *see also New York State Club Ass'n v. City of New York,* 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988). Because the statute may constitutionally be applied to the de-

fendants' conduct, and the defendants do not argue that the statute is written so broadly that it will chill the protected speech of third parties, we also reject their facial challenge to § 438(a)(4).

Without further ado we remand the case to the district court for proceedings consistent with this opinion.

*So ordered.*

RUTH BADER GINSBURG, Circuit Judge, joined by HARRY T. EDWARDS, Circuit Judge, concurring in the court's opinion:

I agree, for reasons well stated in the court's opinion, that the First Amendment does not instruct the judiciary to disturb Congress' sensible and amply justified design. To emphasize two points, however, I add this separate statement. First, the provision challenged here does not differentiate on the basis of the solicitor's *viewpoint.* Second, whatever formula one uses to describe the appropriate "level of scrutiny," decisionmakers in all three branches of government should be alert to this reality: taxing and spending decisions—even those that might appear to offer the individual "a choice" or to leave her "no worse off" than she would have been absent government involvement—*can* seriously interfere with the exercise of constitutional freedoms. *See, e.g., FCC v. League of Women Voters,* 468 U.S. 364, 400–01, 104 S.Ct. 3106, 3127–28, 82 L.Ed.2d 278 (1984) (Congress may not impose blanket requirement that every station receiving Corporation for Public Broadcasting funding refrain from editorializing); *cf. City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 451–52, 105 S.Ct. 3249, 3260–61, 87 L.Ed.2d 313 (1985) (Stevens, J., concurring) (Court's equal protection decisions "reflect a continuum of judgmental responses to differing classifications" rather than three discrete "tiers" of scrutiny).

Government actions of the character we review in this case are most troublesome—and in greatest need of justification—when distinctions are drawn based on the point of view a speaker espouses or when a

benefit is provided contingent on an individual's relinquishing a civil right. *See, e.g., United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 3124–25, 111 L.Ed.2d 571 (1990) (plurality opinion); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 811–12, 105 S.Ct. 3439, 3453–54, 87 L.Ed.2d 567 (1985); *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). This case entails neither of these problematic elements. Although the defendants here repeatedly assert that § 438(a)(4) is antagonistic to certain First Amendment activity—*i.e.*, solicitation, they *do not* contend that the challenged provision was intended to favor or has the effect of favoring a particular speaker or set of ideas. Nor are they able credibly to portray the statute as one that impels political committees and others to desist from enlisting the financial assistance of their fellow citizens.

Section 438(a)(4) does not condition access to FEC contributor lists by ACPA and other fund seekers on their abstaining from solicitation altogether, nor even does it inhibit them from contacting the very individuals whose names appear on the FEC lists they inspect (so long as solicitees' names are obtained from an independent source). The prescription properly ranks with the arrangement upheld by the Court in *Regan v. Taxation with Representation,* 461 U.S. 540, 544, 103 S.Ct. 1997, 2000, 76 L.Ed.2d 129 (1981) (bifurcated statutory regime allows charitable corporation to receive tax deductible contributions if it confines lobbying activity to separate entity that receives nondeductible contributions), and does not exact a "penalty" for the exercise of a constitutional right. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *see also Harris v. McRae,* 448 U.S. 297, 317 n. 19, 100 S.Ct. 2671, 2688 n. 19, 65 L.Ed.2d 784 (1980) (although government need not fund abortion, "substantial constitutional question" would arise if government were to "withhold *all* Medicaid benefits" from a woman who terminated her pregnancy by abortion (emphasis supplied)).

Defendants do not assert that the Commission, in its role as clearinghouse for donor lists, hulks so large that potential or pre-existing channels for obtaining contributor information have been, as a practical matter, sealed off. *See, e.g., Frost & Frost Trucking v. Railroad Comm'n,* 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926). To the contrary, it is evident that IFI may still obtain names of potential contributors in each of two familiar ways: by itself undertaking the effort or by purchasing a list from a seller who has done the sweat work.

EDWARDS, Circuit Judge, concurring in the result.

I concur in the result reached by the majority and in the separate concurring opinion of Judge RUTH BADER GINSBURG.

BUCKLEY, Circuit Judge, concurring:

In my view, this case involves property, not speech. The International Funding Institute ("IFI") seeks the uncompensated use of lists of names and addresses compiled at considerable cost by private parties. The Federal Election Campaign Act, however, recognizes that those lists have economic value, and it protects the reporting committees' exclusive proprietary interest in them by forbidding their use by third parties "for the purpose of soliciting contributions or for commercial purposes." 2 U.S.C. § 438(a)(4).

The protection afforded the committees in this manner does not interfere with IFI's freedom of speech. Moreover, an elementary respect for property and a fair reading of the First Amendment suggest that IFI has no more right to convert such a list to its own commercial uses than Thomas Jefferson would have had to steal the quill from which he fashioned the pen with which he wrote the Declaration of Independence. A list of names and addresses has no more direct a relationship to speech than a goose feather had to the Declaration. Each can be put to uses that may facilitate the production of speech; neither is speech itself.

At some point, the link between speech and an alleged restraint on expression becomes too tenuous to support a constitutional claim. IFI would have us extend the reach of the First Amendment beyond reason when it asks us to sanction what would otherwise be an act of piracy. By forbidding its appropriation of the lists for its own commercial purposes, the statute protects the reporting committees' proprietary interests against unwarranted infringement.

I agree with Judge Randolph that treating the lists as property provides reason enough to find section 438(a)(4) constitutional. It is on this basis that I concur in the majority's judgment.

RANDOLPH, Circuit Judge, concurring in the judgment:

The trichotomy of strict, intermediate and rational-basis scrutiny with its judicial ranking of "compelling," "important," and "legitimate" governmental interests, a trichotomy devised in equal protection cases, seems to me out of place when it comes to analyzing issues concerning the freedom of speech. To be sure, in *Simon & Schuster, Inc. v. New York State Crime Victims Board*, —— U.S. ——, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991), the Court used Fourteenth Amendment "compelling interest" language to decide a First Amendment case. *See also Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652, 657, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1990). This prompted Justice Kennedy to examine the extension's evolution, only to discover that the Court had "adopted this formulation in First Amendment cases by accident rather than as the result of a considered judgment." *Id.* 112 S.Ct. at 513 (Kennedy, J., concurring); *see also Burson v. Freeman*, —— U.S. ——, 112 S.Ct. 1846, 1850 n. 3, 119 L.Ed.2d 5 (1992) (plurality opinion); *id.* at ——, 112 S.Ct. at 1858 (Kennedy, J., concurring). The intermediate standard of review, created for gender discrimination cases in *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), is another matter. The Court has done little more than flirt with the idea of applying it to First Amendment claims.

The controlling opinion in *Barnes v. Glen Theatres, Inc.*, —— U.S. ——, 111 S.Ct. 2456, 2461, 115 L.Ed.2d 504 (1991), offered a variant of intermediate scrutiny to decide whether nude dancing is entitled to First Amendment protection, but that view commanded only three votes. *See id.* 111 S.Ct. at 2467–68 (Scalia, J., concurring in the judgment). A majority of the court embarked on an intermediate scrutiny course with respect to free speech rights of prisoners in *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974), thereafter quoted portions of *Procunier* with approval in *Seattle Times Co. v. Rinehart*, 467 U.S. 20, 32, 104 S.Ct. 2199, 2207, 81 L.Ed.2d 17 (1984), and then retreated in *Thornburgh v. Abbott*, 490 U.S. 401, 408–14, 109 S.Ct. 1874, 1879–82, 104 L.Ed.2d 459 (1989). *Regan v. Taxation with Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), did not even flirt with the idea. Then–Justice Rehnquist's opinion for the Court sustained, against a First Amendment challenge, Congress' refusal to allow organizations engaging in substantial lobbying to remain eligible for tax deductible contributions on the basis that it was "not irrational" for Congress to have made the distinctions that it did. *Id.* at 550, 103 S.Ct. at 2003; *see also International Soc'y for Krishna Consciousness, Inc. v. Rumbaugh*, —— U.S. ——, ——, 112 S.Ct. 2701, 2706, 120 L.Ed.2d 541 (1992).

At all events, I doubt that the majority in this case truly means to apply the sort of intermediate scrutiny employed in the context of the Fourteenth Amendment. In such cases, courts have required that statutory classifications have factual support. *Cf. Burlington Northern R.R. v. Ford*, —— U.S. ——, ——, 112 S.Ct. 2184, 2187, 119 L.Ed.2d 432 (1992). The government must prove that the means chosen are "substantially related" to achieving "important" governmental objectives. *See, e.g., Craig v. Boren*, 429 U.S. at 197, 97 S.Ct. at 456; *Metro Broadcasting, Inc. v. FCC*, 110 S.Ct. 2997, 3008–09 (1990). Without empirical support, the provision will not survive. That is the point of now-Justice Thomas' opinion for this court in *Lamprecht v.*

*FCC*, 958 F.2d 382 (D.C.Cir.1992). I doubt whether such stringent requirements of proof, although an integral part of intermediate scrutiny, can or should be transplanted into the First Amendment area. The accuracy of legislative judgments giving rise to free speech claims is not, as a general matter, readily susceptible to empirical demonstration. *Cf. Burson v. Freeman,* 112 S.Ct. at 1856 (plurality opinion).

The majority's opinion does not convince me that the proviso limiting 2 U.S.C. § 438(a)(4) could survive such stringent analysis. A last-minute floor amendment passed with limited discussion (*see* 117 CONG.REC. 30,057–58 (1971)), the proviso was not supported by any legislative factual findings. The Federal Election Commission has not filled the void in its presentation to us. The record contains no factual support for my colleagues' assumption that the proviso will increase the overall level of speech. Maj. op. at 1117. Allowing others to use contributor lists may reduce the return on a political committee's investment in developing them. But we cannot be certain of this and still less can we say how much the proviso will reduce that return. If others were free to exploit the lists, the developers might increase their level of speech in order to remain the contributor's exclusive object. From the standpoint of the contributors, they might be subjected to more solicitations from others competing for their dollars, which is to say that there would be more speech without the proviso than with it. We simply do not know the true effect of the proviso and, from all that appears, neither did Congress. Under the usual intermediate scrutiny review, such uncertainty would lead to unconstitutionality.

Nonetheless, I agree with the result my colleagues reach. The case seems to me rather easy. As both the majority opinion and Judge Ruth Bader Ginsburg's concurring opinion discuss, the proviso neither directly limits the ability of citizens to speak nor conditions the receipt of a government benefit on the waiver of the right to speak. Nor does it place restrictions on the use of information the government itself has generated and released to the public. The proviso simply restricts a citizen's right to use another's property (here, the contributor lists), property to which no one other than the owner has any separate, independent claim. *Compare Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980); *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). In this respect, it is akin to the protection the Freedom of Information Act gives to trade secrets and other privileged or confidential information (5 U.S.C. § 552(b)(4)) and the trade secret protection some states accord customer lists. R. MILGRIM, MILGRIM ON TRADE SECRETS § 2.09[7][a][1], at 2–253 & n. 281 (1992). It is certainly "not irrational" for Congress to extend similar protection to a political committee's contributor lists. If the government forced political committees to disclose their lists to the public without imposing any restrictions on how the lists might be used, this might constitute a taking under the Fifth Amendment. *Cf. Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1011–12 & n. 15, 104 S.Ct. 2862, 2877, & n. 15, 81 L.Ed.2d 815 (1984). The proviso preserves the property, avoids a taking, encourages compliance with the disclosure laws by removing an incentive to disobey them, and arguably enhances speech by allowing political committees to reap the full benefit of their labors. For its part, the defendant International Funding Institute did not have "a First Amendment right to 'appropriat[e] to itself the harvest of those who have sown.'" *San Francisco Arts & Athletics v. United States Olympic Comm.,* 483 U.S. 522, 541, 107 S.Ct. 2971, 2983, 97 L.Ed.2d 427 (1987) (quoting *International News Serv. v. The Associated Press,* 248 U.S. 215, 239–40, 39 S.Ct. 68, 72–73, 63 L.Ed. 211 (1918)). The proviso draws a line "to assure the due protection" of the rights of private property owners and the interests of citizens in learning the identity of contributors. *Lloyd Corp.,* 407 U.S. at 570, 92 S.Ct. at 2229. The accommodation thus made, while perhaps not constitutionally compelled, is constitutionally permissible.