FEDERAL ELECTION COMMISSION,
Plaintiff,

v.

POLITICAL CONTRIBUTIONS
DATA, INC., Defendant.

89 Civ. 5238 (SWK).

United States District Court,
S.D. New York.

July 30, 1992.

Federal Election Com'n by Vivian Clair, Washington, DC, for plaintiff.

Public Citizen Litigation Group by David C. Vladeck, Washington, DC, and Vladeck, Waldman, Elias & Engelhard, P.C. by Anne C. Vladeck, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Defendant Political Contributions Data, Inc. ("PCD") moves for an order, pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A), awarding it $55,022.89 in attorneys' fees and expenses incurred defending this action in this Court and the Court of Appeals. *See Federal Election Com. v. Political Contributions Data, Inc.*, 753 F.Supp. 1122 (S.D.N.Y.1990), and 943 F.2d 190 (2d Cir. 1991). Because the Court does not have jurisdiction over PCD's application, or in the alternative, because the Federal Election Commission ("FEC"), the plaintiff in the underlying action, was "substantially justified" in bringing suit against PCD, PCD's application for attorneys' fees and expenses is denied.

## BACKGROUND [1]

In 1986, PCD's parent company, Public Data Access, Inc. ("PDA"), compiled specialized contributor lists from the FEC computer tapes recording campaign con-

---

**1.** The Federal Election Campaign Act ("FECA") requires all political committees supporting a candidate or candidates for election to Federal office to file reports of their respective contributors and the corresponding donations with the FEC. 2 U.S.C. § 434(b)(3)(A). In turn, FECA requires that all such reports filed with the FEC be made available to the public for inspection and copying. 2 U.S.C. § 438(a)(4). This broad *public disclosure policy was qualified, however,* in 1971 by 2 U.S.C. § 438(a)(4), which provides that "any information copied [from the FEC public records] ... shall not be sold or utilized by any person for the purpose of soliciting contributions or any commercial purpose." The prohibition aimed to protect the privacy of those "very public-spirited citizens" who contribute to political campaigns and those who might contribute if disclosure of their identity were limited. 117 Cong.Rec. 30,057 (daily ed. Aug. 5, 1971) (statement of Sen. Bellmon). It was believed that without this prohibition, donating citizens would be subjected to "all kinds of harassment." 117 Cong.Rec. 30,057 (daily ed. Aug. 5, 1971).

tributors. PDA then requested that the FEC issue an advisory opinion as to whether the selling of these lists comported with the statutory prohibition set forth in 2 U.S.C. § 438(a)(4). The FEC did so (Advisory Opinion 1986–25), concluding that the "proposal to engage in the for-profit business of selling lists of individual contributor information copied from reports filed with the Commission" would constitute use and sale for a "commercial purpose," thus violating 2 U.S.C. § 438(a)(4). Advisory Opinion 1986–25, attached as Exhibit "3," to FEC Complaint.

Despite the Advisory Opinion ("AO 1986–25"), PDA incorporated PCD to market these contributor lists. Shortly thereafter, the National Republican Congressional Committee filed a complaint with the FEC concerning PCD's lists, prompting the FEC to investigate PCD's activities. The FEC found "probable cause to believe" that PCD was violating the "commercial purpose" language of 2 U.S.C. § 438(a)(4), and after conducting unsuccessful negotiations with PCD, the FEC brought this action for declaratory and injunctive relief, and civil penalties.

Subsequently, this Court granted summary judgment to the FEC, finding that the FEC's interpretation of 2 U.S.C. § 438(a)(4), i.e., that the "commercial purpose" language could include activities "other than direct political solicitation," was reasonable and that under such interpretation, PCD's sales of contributor information lists could reasonably be characterized as for "commercial purposes." *Federal Election Com.*, 753 F.Supp. at 1126.

Furthermore, this Court found that the FEC had correctly concluded that PCD's lists were not exempt from the prohibition under the "media exception," contained in 11 C.F.R. § 104.15(c) (the "Regulation").[2] *Federal Election Com.*, 753 F.Supp. at 1129.

On appeal, the Court of Appeals reversed this Court's decision and entered summary judgment in PCD's favor. The Court of Appeals held that PCD's use and sale of these lists was not proscribed by 2 U.S.C. § 438(a)(4) because the contributors' addresses and phone numbers were not contained on PCD's marketed lists and the lists specifically stated that the government forbade the information contained in the lists from being used for solicitation purposes. It further held that the FEC's interpretation of the Regulation, as set forth in AO 1986–25, was "unreasonable," as it limited the "media exception" to those communications which were not using the FEC information principally to further sales. The Court of Appeals found this interpretation to be contrary to "both the words of the statute and the act's [FECA's] broader purpose" of promoting public disclosure. *Federal Election Com.*, 943 F.2d at 196.

The FEC did not appeal the Second Circuit's decision, and, on December 19, 1991, PCD filed its motion for an award of attorneys' fees and expenses under the EAJA.[3]

It is undisputed that PCD is the prevailing party in the underlying action concerning the alleged violation of 2 U.S.C. § 438(a)(4).[4] Thus, the disputed issues to be resolved in the present application for

**2.** The Regulation was adopted by the FEC in furtherance of 2 U.S.C. § 438(a)(4). The Regulation provides in pertinent part, that the copying of the FEC's reports by "newspapers, magazines, books or other similar communications is permissible as long as the principal purpose of such communications is not to communicate any contributor information ... for the purpose of soliciting contributions or for other commercial purposes." 11 C.F.R. § 104.15(c) (1992).

Once the FEC concluded that an organization's activities were for a "commercial purpose," it would determine whether the activities fell within the exemption for the specified media sources which would preclude a violation of 2 U.S.C. § 438(a)(4).

**3.** The EAJA provides in pertinent part that: a court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action ... brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust. 28 U.S.C. § 2412(d)(1)(A).

**4.** The Second Circuit directed summary judgment in PCD's favor. *Federal Election Com. v. Political Contributions Data, Inc.*, 943 F.2d 190 (2d Cir.1991).

**314**

attorneys' fees and expenses are (I) the timeliness of PCD's application;[5] (II) whether the FEC's position was "substantially justified"; and (III) if PCD did submit its application within the appropriate time period, and if the FEC's position was not substantially justified, what monetary award should be granted to PCD.

## DISCUSSION

### I. Timeliness of Application

■ It is well established that unless an EAJA application for an award of fees and expenses is submitted within thirty days of final judgment in the underlying action, the Court lacks jurisdiction over the action. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941) ("the terms of [the Government's] consent to be sued in any court define that court's jurisdiction to entertain the suit"); 28 U.S.C. § 2412(d)(1)(B) ("within thirty days of final judgment in the action").

For purposes of commencing the 30-day filing period, "final judgment" has been defined as "a judgment that is final and not appealable." 28 U.S.C. § 2412(d)(2)(G). While there is no doubt that the finality of a judgment is most definitive when the statutory time limit for appealing the decision has actually expired, for EAJA purposes, a judgment has been found to be final when the "losing party asserts that no further appeal will be taken." *Taylor v. United States*, 749 F.2d 171, 174 (3d Cir. 1984) (citing *McDonald v. Schweiker*, 551 F.Supp. 327, 330 (N.D.Ind.1982), *rev'd*, 726 F.2d 311 (7th Cir.1983)).

While PCD agrees that a judgment may be deemed final when the losing party asserts it will not appeal the decision, it con-

tends that the 30-day time period does not begin running until the losing party makes a "legally" or "formally" binding[6] assertion that it will not appeal. The Court disagrees, and holds that such "formal" notification is not required. Rather, as the Eleventh Circuit held in *Myers v. Sullivan*, 916 F.2d at 679, all that is required to commence the 30-day filing period is "clear and unequivocal notice" that the judgment will not be appealed. *Id.* (since three of the four plaintiffs were given "no clear indication that [the Secretary of Health and Human Services] would not file appeals," the Court held that the 30-day period did not commence until the time to file an appeal expired; there was no requirement, however, that the notice be "legally" binding upon the Government).

■ In this case, the FEC provided clear and unequivocal notice that the Court of Appeals' decision would not be appealed. Such notification was given in response to a letter from PCD's attorney, David C. Vladeck, which specifically requested information concerning the status of an appeal. Mr. Vladeck requested that the FEC "inform [him] of the Commission's intentions" with respect to continuing the litigation. Letter dated October 2, 1991, attached to FEC Opposition to Motion for Award of Attorneys' Fees and Costs ("Pl.Opp."), as FEC Exhibit "1." He also informed the FEC that "if the Commission [did] not intend to pursue th[e] litigation further, then [he] [would] simply go ahead and file [his] fee application with the District Court...." *Id.*

Richard Bader, FEC's attorney, responded by letter dated October 30, 1991 (the "Bader letter"), definitively advising that

---

5. The EAJA requires that the party applying for an award submit such application "within thirty days of final judgment in the action." 28 U.S.C. § 2412(d)(1)(B).

6. PCD does not explicitly define what it would deem "legally" or "formally" binding, but this Court assumes from PCD's language and from the cases that PCD cites that it intends the terms to mean that "the government must bind itself not to appeal in some enforceable way," *see* Reply Of Defendant Political Contributions Data, Inc. To The Federal Election Commis-

sion's Opposition To Defendant's Motion For An Award Of Attorneys' Fees and Litigation Expenses, at 3–4, or that there must be some discrete event indicating the finality of judgment. *See, e.g., Myers v. Sullivan*, 916 F.2d 659 (11th Cir.1990) (post-remand final judgment of dismissal entered with the government's consent); *Smith v. Sullivan*, 739 F.Supp. 812 (S.D.N.Y.1990) (remand order dismissed case with prejudice pursuant to a settlement and *government stipulated that no further appeal would be taken*).

no appeal would be taken. Additionally, the Bader letter set forth reasons which demonstrated that the FEC would not revoke its decision. Specifically, the letter stated that:

> Because of the narrowness of the court's decision and the pendency of other cases raising the broader statutory and constitutional issues that constituted the bulk of the arguments in this case, the Commission has decided not to seek certiorari in the PCD case. Letter dated October 30, 1991, attached to Pl.Opp., as FEC Exhibit "B."

This Court finds that Bader's letter commenced the 30–day filing period as it clearly fulfilled *Myers* demand for "clear and unequivocal notice." Bader's letter constituted the final judgment for purposes of the EAJA, just as the Government's letters to the court and the prevailing party did in *Taylor*. Contrary to PCD's contention, notifying a court does not result in any greater legal consequence than merely notifying the other party, as was done by the FEC in this case. In either situation, a court may estop a losing party which has executed such notification from subsequently instituting an appeal. Furthermore, Mr. Vladeck's letter clearly demonstrates that he intended to rely upon the FEC's response in determining whether to move for attorneys' fees and expenses, regardless of whether or not the FEC notified the Court of its choice.

■ Accordingly, the 30–day period for filing an application for fees and expenses expired on November 29, 1991 (30 days after Mr. Bader wrote his letter), nearly a month before PCD filed its application on December 19, 1991.[7]

## II. *Substantially Justified Governmental Claim*

■ The Court holds alternatively that even if the Court did have jurisdiction, PCD's application would properly be denied on the grounds that the FEC's position in the litigation was "substantially justified." Costs and fees pursuant to 28 U.S.C. § 2412(d)(1)(A) may not be awarded to a claimant, if "the position of the United States was substantially justified." The Supreme Court has determined that a position is "substantially justified" if it has a "reasonable basis both in law and fact" or if it "could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988); *accord Cohen v. Bowen*, 837 F.2d 582, 585 (2d Cir.1988); *Jean v. Nelson*, 863 F.2d 759, 767 (11th Cir.1988); *Myers*, 916 F.2d at 666; *United States v. Yoffe*, 775 F.2d 447, 449–50 (1st Cir.1985); *United*

---

7. PCD contends that two other factors should be considered by the Court in determining whether the time for filing had expired prior to the actual filing. First, PCD claims that because FEC did not correct PCD when PCD stated by mail and telephone that it considered December 21, 1991 to be the final date for filing, November 29, 1991 cannot be the date on which the 30–day period expired. This argument is without merit and does not effect the timeliness of PCD's application as the FEC had no duty to inform PCD of the correct date.

Second, PCD contends that because the FEC, itself, did not believe that Mr. Bader's letter commenced the 30–day filing period, PCD should not have been expected to recognize the significance of the letter's date. PCD argues that if November 29, 1991 were the final day for filing an application for fees and expenses, the FEC would not have engaged in settlement discussions through December 17, 1991. That the FEC engaged in settlement discussions after November 29, 1991, is not, however, dispositive as the FEC may still have paid PCD's attorneys'

fees and expenses despite the absence of a legal obligation to do so. Further, the record in this case reveals that there was substantial confusion concerning the date on which the filing period expired. Given this confusion, the FEC could be expected to explore all possibilities, including settlement, in case final judgment was found not to have been entered on October 30, 1991. But even if the FEC did not recognize that Mr. Bader's letter would signify the final judgment for purposes of 28 U.S.C. § 2412(d)(1)(B), this would not alter the fact that the letter did in fact commence the filing period. *See Long Island Radio Co. v. NLRB*, 841 F.2d 474 (2d Cir.1988) (because the United States government had statutorily established the length of time after an action during which it would diminish its immunity from suit, the NLRB could not voluntarily extend the filing deadline). Accordingly, the notice given by Mr. Bader's letter constituted "final judgment" on October 30, 1991 and the time for filing an application for fees and expenses expired on November 29, 1991.

*States v. First Nat. Bank,* 732 F.2d 1444, 1447 (9th Cir.1984).

 The D.C. Circuit established a 3-prong test to determine whether a position taken by the Government was "substantially justified." *See Spencer v. NLRB,* 712 F.2d 539 (D.C.Cir.1983).[8] Under *Spencer,* a court should examine (i) the clarity of the governing law, (ii) the foreseeable length and complexity of the litigation, and (iii) the consistency of the government's position, in determining whether the position of the Government was substantially justified. *Spencer,* 712 F.2d at 559–60. Based upon a review of these three factors, the Court finds that the FEC's position was "substantially justified."

#### (i) Clarity of the Governing Law

At the time the FEC brought suit against PCD for selling lists of contributor data, in violation of 2 U.S.C. § 438(a)(4), there was little congressional or judicial guidance concerning the relevant statutory provisions. In fact, congressional enactments promoted competing interests. While the general purpose of FECA was to provide total disclosure of political contribution data, 2 U.S.C. § 438(a)(4) aimed to protect contributors and would-be contributors from solicitors by limiting the distribution of contribution data. *Federal Election Com.,* 943 F.2d at 191. Even the Court of Appeals recognized the tension between 2 U.S.C. § 438(a)(4), and the general purpose of FECA, and in fact, concluded that because the language of 2 U.S.C. § 438(a)(4) seemingly undermined the general purpose of FECA, it could not interpret the statute according to its plain meaning. *Federal Election Com.,* 943 F.2d at 194–95.

Further, the legislative history supplied the FEC with few guidelines for the interpretation of 2 U.S.C. § 438(a)(4). The only aid which the congressional records provided was to indicate to which activities the statute would apply. The discussion on the Senate floor revealed merely that list brokers were explicitly proscribed from selling lists of donors and donations and that newspapers were expressly permitted to publish such lists. 117 Cong.Rec. 30,057–58 (1971). Thus, the Senate created a broad spectrum between permitted and proscribed activities, but did not furnish the FEC with any further direction as to the proper treatment of other actors which copied FEC records for sale but which could not be defined either as newspapers or list brokers.

Nor had the courts offered any meaningful interpretation of 2 U.S.C. § 438(a)(4) or the Regulation, 11 C.F.R. § 104.15(c), prior to this suit. The only decision addressing the legality of a similar distributor's activities under 2 U.S.C. § 438(a)(4), *National Republican Congressional Committee v. Legi–Tech Corp.,* 795 F.2d 190 (D.C.Cir. 1986) *("NRCC"),* refused to determine whether the organization's lists were forbidden, or even to enumerate characteristics common to a prohibited activity or to a "media exception," similar to newspapers. The Court instead found that Congress, in enacting 2 U.S.C. § 438(a)(4), had " 'left a gap for the [FEC] to fill' in determining what commercial activities f[e]ll within the proviso's prohibition (actively akin to that of a list broker) and what commercial activity [was] not proscribed (activity akin to that of a newspaper)." *NRCC,* 795 F.2d at 193. The Court then found that the FEC had filled this gap with the Regulation, 11 C.F.R. § 104.15(c), but that since the FEC had not yet interpreted this regulation, the Court had to defer to the FEC for any substantive determination. *NRCC,* 795 F.2d at 193. Thus, the FEC was given no guidelines, and instead was encouraged to interpret its own Regulation.

#### (ii) Foreseeable Length and Complexity of the Governing Law

The record indicates that the FEC did not engage PCD in a foreseeably lengthy or complex proceeding. In fact, the FEC originally aimed to settle its dispute with PCD through negotiations, and it was not until it

---

**8.** In Pierce, the Supreme Court held that the *Spencer* standard was more demanding than the EAJA required. However, the Court finds that the *Spencer* test remains relevant to the determination of whether the FEC's position was "substantially justified."

appeared that no settlement could be reached that the FEC filed this suit. Moreover, since this action predominately involved issues of law, neither party should have expected the proceedings to be particularly lengthy or complex.

Further, review of an agency's action, such as the FEC's, is frequently prompt and uncomplicated, as a court must uphold the agency action unless the agency's interpretation is found to be "unreasonable." *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### (iii) Consistency of the Government's Position

In *Spencer*, the D.C. Circuit held that if the Government was found to have " 'single[d] out' particular private parties ... [and] adopt[ed] a general policy in dealing with cases of a given variety but take[n] a different position inexplicably or maliciously in one or a few cases," it was necessary for the Government to present an especially powerful justification for its position in order to avoid paying the prevailing party's attorneys' fees and expenses. *Spencer*, 712 F.2d at 560–61. The FEC's position in the underlying action manifested none of the above attributes.

Since the FEC had not previously interpreted its regulation, and had not attempted to classify organizations as either similar to the specifically prohibited "list brokers" or to the explicitly exempted "newspapers," prior to AO 1986–25 issued to PCA, it is not possible that the FEC's position was inconsistent. Moreover, the FEC's position in this action greatly resembled the position of the plaintiff in the primary precursor to this case, *NRCC. NRCC*, 795 F.2d 190.

Furthermore, in this case, the Government never changed its position during the course of the proceedings or acknowledged the merit of its adversary's claims. In *Myers*, where three of the four consolidated plaintiffs were awarded attorneys' fees, the Secretary of Health and Human Services or the Appeals Council for the agency ultimately awarded Social Security benefits which originally had been denied by the Secretary.[9] *Myers*, 916 F.2d at 662–64. This implicit admission that the Secretary improperly denied benefits lends significant weight to the conclusion that the Government's position was not "substantially justified." In this case, however, the FEC neither capitulated, nor adopted a different or more harsh position with PCD than with other possible violators. Accordingly, this Court finds that the FEC's position satisfies each prong of the *Spencer* test.

Beyond the *Spencer* analysis, the Court finds that the position adopted and pursued by the FEC had a "reasonable basis both in law and fact" as "could satisfy a reasonable person." *Pierce*, 487 U.S. at 565, 108 S.Ct. at 2550.

The Court of Appeals found both the FEC's interpretation of 2 U.S.C. § 438(a)(4) and the FEC's application of that interpretation to PCD to be "unreasonable." Consequently, PCD would have this Court adopt the conclusion that the FEC's position cannot satisfy the "reasonable" standard established in *Pierce*. But it is a well-established rule that a court defers to an agency's interpretation unless it finds it to be "unreasonable." *See Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 844, 104 S.Ct. at 2782. Thus, using PCD's analysis, any decision overruling an agency's interpretation would automatically result in the Government paying attorneys' fees and expenses to the other party. As *Spencer* concluded, however, Congress did not intend 28 U.S.C. § 2412(d)(1)(A) to be an automatic fee-shifting device. *Spencer*, 712 F.2d at 550. Accordingly, this Court may not terminate its inquiry with the Court of Appeals' conclusion that the FEC's interpretation was "unreasonable," but rather, the Court must examine the legal basis for the FEC's interpretation of the Regulation and the factual basis for the FEC's determination that PCD was akin to a "loan broker."

---

**9.** The fourth plaintiff was denied attorneys' fees due to an untimely application, not because the Secretary was found to be "substantially justified."

As set forth above, the FEC adopted its interpretation of the Regulation and its corresponding litigation position in the absence of any contrary, or even clear, guidance from either Congress or the courts. Moreover, there was never any indication prior to this litigation that the FEC's interpretation was unreasonable. In fact, the *NRCC* Court discussed the Regulation, yet never suggested that the Regulation's "principal purpose" clause [10] (the FEC's interpretation of which the Court of Appeals subsequently found "unreasonable") would affect the reasonableness of the FEC's interpretation, or that the clause varied from congressional intent.[11] *NRCC*, 795 F.2d at 193.

Further, in adopting the Regulation and issuing AO 1986–25, the FEC was forced to reconcile the two conflicting goals of FECA, namely "total" disclosure and the protection of public-spirited contributors. In trying to accommodate these competing objectives, the FEC fashioned a distinction between use of contributor information which was "incidental" to sales, and use for which the "primary focus" was creating sales (the former deemed permissible and the latter prohibited). AO 1986–25, at 4.

Ultimately, the Court of Appeals found this distinction to be "unreasonable," as it impermissibly narrowed the "media exception" of the Regulation and the "newspaper exception" of 2 U.S.C. § 438(a)(4).[12] *Federal Election Com.*, 943 F.2d at 196. The Court of Appeals thus placed greater emphasis on the importance of public disclosure than the FEC had, but the FEC had not abandoned the pursuit of disclosure in its interpretation; it simply had attempted to establish a compromise, alleviating the inherent tension between the two goals. Given the conflict between FECA's terms, the lack of congressional and judicial guidance, the ambiguous gap which the FEC was required to fill, and that the legislative history only established a "newspaper exception," not an exception encompassing "similar communications,"[13] this Court finds that the FEC's position had a reasonable basis in law and was "substantially justified."

The FEC's factual determination that PCD's activities were prohibited under 2 U.S.C. § 438(a)(4) was also reasonable. The legislative history suggests a broad continuum along which permitted and prohibited activities are to be classified, but Congress failed to indicate how particular classifications should be determined. The *NRCC* Court found FECA "ambiguous" as to which activities were similar to newspapers and which were similar to list brokers and provided that the FEC was the proper body to determine an activity's permissibility. *NRCC*, 795 F.2d at 192.

Relying upon the following factors, the FEC reasonably characterized PCD as akin to prohibited list brokers: (i) the list format in which the information was distributed; (ii) the individualization and specialization of the lists available to accommodate PCD's clients' needs; (iii) PCD was incorporated exclusively for the purpose of advertising, marketing, and selling printed compilations of the FEC information; (iv) political parties or candidates and political con-

---

**10.** The principal purpose clause provides in relevant part:

"The use of information ... in newspapers, magazines, books or other similar communications is permissible *as long as the principal purpose of such communications* is not to communicate any contributor information listed on such reports for the purpose of soliciting contributions or for other commercial purposes." 11 C.F.R. § 104.15(c) (emphasis added).

**11.** The Second Circuit's opinion ultimately held that the FEC's construction of the "principal purpose" prohibition constituted an "unreasonable" limitation upon Congress' intent, as demonstrated in both 2 U.S.C. § 438(a)(4) and the

"act's broader purposes." *Federal Election Com.*, 943 F.2d at 195–96.

**12.** In a discussion of the purpose of 2 U.S.C. § 438(a)(4) prior to adoption, Senator Nelson asked Senator Bellmon, who presented the amendment to FECA on the Senate floor, whether under the amendment, "newspapers may, if they wish, run lists of contributors and amounts [?]." Senator Bellmon responded affirmatively, and no further media sources were designated as exempt from the 2 U.S.C. § 438(a)(4) prohibition. 117 Cong.Rec. 30058, col. 1.

**13.** *See supra*, n. 12.

sultants—clients who reasonably could be expected to make solicitations—comprised two-thirds of PCD's customers; and (v) during the FEC's investigation of PCD's customers, two customers indicated that they had intended to use PCD's list to solicit money for future campaigns. *Federal Election Com.*, 753 F.Supp. at 1130.

The Court of Appeals found that because only two of PCD's clients had purchased the reports for solicitation purposes and neither had actually used the lists for those purposes, PCD's activities constituted "similar communications," exempted under the Regulation's "media exception." But that some of PCD's clients were interested in the lists for the exact purpose prohibited by 2 U.S.C. § 438(a)(4) indicates that the FEC did have a reasonable basis in fact to believe that PCD's activities may have violated the prohibition. Although PCD's lists did not contain street addresses or telephone numbers, they were hardly useless to a buyer aiming to make solicitations based on the information contained. Contributors' names, towns, states, and zip codes, and occasionally occupations, were distributed along with the amount of the respective contributions. Given this information, it would be quite simple to gather the missing information or contact the people despite its absence. Additionally, that a warning existed is not dispositive, as it is certainly conceivable that list brokers, clearly prohibited enterprises under 2 U.S.C. § 438(a)(4), could also include a warning in an effort to limit their own liability.

Had PCD distributed a standard list of contributors' names and donations, as well as other information concerning political committees' funding, spending, activities, and had PCD's clients been primarily professors and research institutes, the FEC might not have been "substantially justified" in arguing that PCD's activities violated the "commercial purpose" prohibition. But PCD's actual lists and clients were not nearly so definitively exempted.

Finally, the "incident to" and "primary focus" terms used in AO 1986–25 which led the Court of Appeals to find the FEC's interpretation to be "unreasonable" and contrary to the general purpose of FECA, were not the sole factors inducing the FEC to file suit against PCD. While the FEC did find PCD's use of the FEC records to be more than incidental to sales, the FEC grouped PCD with "list brokers," rather than with "similar communications" for additional reasons as well. The factors enumerated above, concerning the format of PCD's product, its clients, and its exclusive purpose, also supported the PCD's "list broker" classification. These factors may have reasonably led the FEC to the same conclusion, even in the absence of the flawed "incident to"/"primary focus" distinction. Consequently, this Court finds that the FEC's position that PCD was "actively akin" to list brokers, rather than newspapers, was reasonably based in fact, and thus, "substantially justified."

This Court further rejects PCD's contention that the Court of Appeals' opinion, which was "sharply critical of the FEC's argument," precludes a finding that the FEC's position was substantially justified. Memorandum Of Law In Support of Defendant's Application For An Award Of Attorneys' Fees And Litigation Costs, at 4–5. PCD's argument effectively ignores the Supreme Court's decision in *Pierce*. *Pierce* held that even a "string of losses" or a "string of successes" could only be "indicative" of whether the government's position was "substantially justified." *Pierce*, 487 U.S. at 565, 108 S.Ct. at 2550. Such a rule of law certainly would not permit this Court to find that a single decision against the FEC by the Court of Appeals necessitates, or even suggests, a finding that the FEC was not "substantially justified." PCD's argument is particularly weak in light of this Court's earlier decision favoring the FEC, which at the very least invites doubt to the proposition that the government's position was not "justified to a degree that could satisfy a reasonable person." *Pierce*, 487 U.S. at 565, 108 S.Ct. at 2550. Nor does the Court of Appeals' deciding the case on summary judgment indicate that the FEC was not "substantially justified," as *Pierce* held that where "the dispute centers upon questions of law rath-

er than fact," the "objective fact that the merits were decided at the pleadings stage" only proves that the judge was "efficient," not that the Government had a weak position. *Pierce*, 487 U.S. at 568–69, 108 S.Ct. at 2551–52. Accordingly, PCD's argument does not alter this Court's finding that the FEC was "substantially justified" under *Pierce* and the *Spencer* test.

III. *Appropriate Monetary Award*

As this Court finds that no attorneys' fees and expenses should be awarded under 28 U.S.C. § 2412(d)(1)(A), there is no need to determine the appropriate hourly rate to be afforded to PCD's attorneys.

See also, 807 F.Supp. 323.

## CONCLUSION

For the reasons set forth above, the Court finds that PCD's application for an award of attorneys' fees and costs, pursuant to the Equal Access for Justice Act, was untimely and is thus denied. The Court further finds that even if the application was timely, the award would be denied, as the FEC was "substantially justified" in bringing suit against PCD.

SO ORDERED.